Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence, rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, MODIFIES in part and AFFIRMS in part the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties at the hearing before the deputy commissioner as:
 STIPULATIONS
1. Defendants continued to pay compensation to plaintiff under a Form 21 agreement through the date of hearing.
2. In addition, the parties stipulated into evidence the following:
a) Form 19 dated April 7, 1995.
b) Defendants' response to plaintiff's interrogatories.
c) An indexed packet of medical records and reports.
 d) Seven additional pages of medical reports from Dr. Thomas.
 ***********
Based upon all of the competent evidence in the record, the Full Commission adopts the findings of fact of the deputy commissioner with modifications and finds as follows:
 FINDINGS OF FACT
1. At the time of hearing before the deputy commissioner, plaintiff was forty-six years old. He has an associate's degree from Wingate College, plus additional college courses. In February 1989 he was employed by defendant-employer as a salesman for the company and had been similarly employed by the company's predecessor for approximately five years. His sales territory included North Carolina, South Carolina and part of Georgia at the time in question.
2. On February 2, 1989 plaintiff sustained a compensable injury by accident as he was driving down a two-lane road in rural South Carolina while on company business. A log truck was approaching from the other direction and, at the moment the two vehicles were abreast, a chain from the log truck crashed through the window of plaintiff's car and struck him on the chest and left arm. The blow was so forceful that it penetrated his chest, ruptured his diaphragm, ruptured his stomach and mangled his left arm. Realizing that he would die if he stopped at the scene, plaintiff managed to drive to where he could get help. He was then rushed to the emergency room of Spartanburg Regional Medical Center.
3. Plaintiff was almost immediately sent to the operating room for emergency surgery. Dr. John Tate, a general surgeon became his primary treating physician. In surgery, Dr. Tate found the ruptured diaphragm, fractured ribs, and a laceration of the stomach with spillage of gastric contents into both the chest and abdominal cavities. The wounds to his torso were repaired and cleaned by Dr. Tate and a small procedure was performed by Dr. Henderson to stabilize his left arm, but the arm required extensive surgery and plaintiff was otherwise too ill for such an operation. Within twenty-four hours plaintiff developed severe sepsis and required extensive treatment with antibiotics and a strong antifungal medication. Due to the infection, tissues within his abdominal cavity would begin to die, so Dr. Tate performed over a dozen laparotomies to clean out the necrotic tissue. At some point, the doctor decided it would be best to leave the surgical wound open since further operations would be necessary, so the incision and exposed organs were simply packed with sterile material between procedures.
4. During this time plaintiff also developed adult respiratory distress syndrome and had to be placed on a ventilator, and his kidneys failed for a period of time. Dr. Tate consulted with multiple other physicians during his hospitalization. Plaintiff was in the intensive care unit for over two months and the doctors were surprised that he lived. By the time the infection was under control, Dr. Tate had removed his spleen, most of his pancreas and much of the omentum covering his internal organs. He was also noted to have developed adhesions around his intestines.
5. Since the incision had been left open for so long, the tissue had retracted and Dr. Tate could not close the wound. Consequently, he had to gradually stretch the skin and muscles to the point that they could be reconnected. The wound was eventually closed successfully. Once plaintiff was able to move around some, he noticed numbness in his feet and legs, and that he had a bilateral foot drop when walking. Dr. Tate consulted with a neurologist and they concluded that he had nerve damage associated with malnutrition or from the high powered medications he had been taking, or both. However, no nerve testing was performed.
6. Plaintiff was discharged from the hospital on May 20, 1989. By that time he was able to eat and walk with a cane. He was then evaluated by Dr. John Keith, an orthopedic surgeon, regarding the status of his left arm. There was a sizable area where he had lost the skin and muscle, and a two to three inch section of his radius bone was missing. Dr. Keith recommended that a section of muscle and skin be removed from his shoulder blade area and implanted microsurgically in the gap on his left arm. This procedure was performed on October 10, 1989 in conjunction with surgery by Dr. Stephen Harley, the orthopedic surgeon who was addressing the problems with the bones in the arm and hand. Dr. Harley performed that operation and several other surgeries to attempt to reconstruct the shaft of the radius. His efforts proved to be unsuccessful, however, so he later operated to fuse the radius to the ulna in order to give plaintiff a one-bone forearm. Despite his efforts, plaintiff ultimately lost essentially all use of the hand and forearm except for some very minimal functions.
7. Dr. Harley last evaluated plaintiff on January 24, 1994 at which time he determined that plaintiff had reached maximum medical improvement with regard to his right and left upper extremities, with one hundred percent impairment of his left upper extremity and twenty percent permanent partial disability to plaintiff's right arm because of the residual weakness from the surgical removal of the muscle at the shoulder blade. Dr. Harley was of the opinion that plaintiff would not be able to return to gainful employment due to the extreme injuries sustained in the accident.
8. In September 1994 plaintiff was evaluated by Dr. Andrea Stutesman. Plaintiff complained of an inability to use his left arm, bilateral foot drop, non-insulin dependent diabetes, difficulty breathing especially with exertion, hoarseness, frequent urination especially at night, and sexual dysfunction. Due to his neurologic signs, she referred him for nerve testing. The testing was indicative of a lesion in his cervical spine. Dr. Stutesman referred plaintiff for an MRI, which revealed marked compromise of the cervical cord at three levels: C4-5, C5-6 and C6-7, with disk herniation at C5-6 and C6-7.
9. Dr. Stutesman was very concerned about the findings of the diagnostic tests. There was already evidence of nerve damage in plaintiff's remaining good arm and there was a significant risk that the condition of his arm would worsen with spur formation in the spine. This risk was in addition to the probability that the cervical spine condition was already a factor in his sexual dysfunction, his urinary frequency, his foot drop and his other leg problems. He had to rely heavily on his dominant right arm and she did not believe that he could stand to lose the use of it as well as his left one. Consequently, she strongly urged him to see a neurosurgeon. However, plaintiff had apparently reached his tolerance limit for doctors and particularly surgery, so he refused. Therefore, Dr. Stutesman completed the impairment evaluation.
10. On October 3, 1994 Dr. Stutesman rated plaintiff with a 49% permanent partial disability to his back, 13% permanent partial disability to his right lower extremity, 18% permanent partial disability to his left lower extremity, 19% permanent partial disability to his right upper extremity, and 100% permanent total disability to his left upper extremity. In addition to the above ratings, Dr. Stutesman rated plaintiff's lost or injured organs as follows: 51-100% of each lung, 49% of the upper digestive tract, 5% due to diabetes, 100% loss of spleen, 29% of the air passage, 14% speech impairment, 9% of sexual function, and 25% of skin flexibility.
11. Defendants admitted liability for workers' compensation benefits for the injury in question and have paid compensation to plaintiff pursuant to a Form 21 agreement which has been approved by the Industrial Commission.
12. As a result of the catastrophic injuries plaintiff sustained in his February 2, 1989 injury and the subsequent complications, he has been rendered totally and permanently disabled. He has been and will likely remain unable to work and earn wages in any employment capacity. His activities are very limited. He has severe shortness of breath, particularly with any activities; he has difficulty walking because of his foot drop and partial loss of sensation; he has developed diabetes as a result of the damage to his pancreas and has also developed problems with triglycerides related to his injuries; he has had low back pain with sitting for prolonged periods of time; he has had problems with chronic diarrhea due to the pancreatic impairment; and he has had limitations in his right hand so that he can no longer do much paperwork. Nerve conduction testing revealed evidence of carpal tunnel syndrome in his right hand which was probably due to the way he has used that hand since losing the use of his left one. He has also experienced depression but has not sought treatment for that problem.
13. In that he has sustained significant impairments and organ damage, plaintiff has requested a ruling regarding the value of that compensation so that he can make an informed election of benefits.
14. As a result of the injury by accident giving rise to this claim, plaintiff has sustained one hundred percent loss of his left arm, twenty percent permanent partial disability to his right arm, eighteen percent permanent partial disability to his left leg, thirteen percent permanent partial disability to his right leg and forty-nine percent permanent partial disability to his back. Although his cervical spine condition was not identified until years after the injury, plaintiff was having symptoms consistent with a cervical problem during his initial hospitalization but the nature of his injuries and resulting illness was such that the problem could easily have been overlooked since the symptoms were consistent with other factors known to exist. He did not have any subsequent injuries and the mechanism of the accident could have injured his cervical spine. Consequently, his cervical spine condition was proven to have been a proximate result of the injury by accident giving rise to this claim.
15. In addition, plaintiff sustained permanent damage to important internal organs and parts of the body. He has lost his spleen, an important organ which filters the blood and plays a role in providing resistance to infection. Consequently, he is now at a slightly greater risk for developing certain infections, particularly pneumonia. Fair and equitable compensation for the loss of his spleen is the maximum amount allowed of $20,000.00.
16. Plaintiff also lost most of his pancreas, an important organ which secretes insulin and enzymes used to digest and absorb foods. As a result of this loss, plaintiff has developed diabetes and chronic diarrhea. Fair and equitable compensation for the damage to his pancreas is the maximum amount allowed of $20,000.00.
17. As a result of the injuries to his diaphragm, ribs and lungs, his subsequent left pneumothorax and the respiratory distress syndrome, plaintiff has sustained serious loss of respiratory function which qualifies as a Class IV restrictive impairment. The relative contribution of the various problems could not be separated since the functions are interrelated. The ultimate effect is that his lung's ability to function has been severely compromised. The lungs are essential organs and equitable compensation for this damage is the maximum allowed of $20,000.00 for each lung.
18. Plaintiff also sustained damage to his abdominal wall due to the multiple surgeries and the fact that the incision was kept open for a prolonged period. He has hernias in the tissue which may give him further problems and require future medical treatment and surgery. The abdominal wall not only supports the front of the torso, it also supports the back, and residual weakness causes plaintiff to be prone to back pain. Furthermore, too much stress on it could cause further problems so he must restrict his use of it. Consequently, the abdominal wall is an important part of the body and equitable compensation for the damage to it is $15,000.00.
19. Within the abdominal cavity, plaintiff also lost much of his omentum to infection. The omentum is a fat pad which protects the internal organs and is the first line of defense when there is a blow to the abdomen. Especially in view of the damage sustained to his internal organs as a result of the accident, plaintiff's omentum is an important part of his body. The fair and equitable amount of compensation for the damage to his omentum is $10,000.00.
20. Due to his multiple operations, plaintiff developed adhesions of the bowels. The adhesions could lead to future problems and serious risk to plaintiff if future abdominal surgery is required. The intestines are an important part of the body and the equitable amount of compensation for the damage caused by the adhesions is $12,000.00.
21. Plaintiff's stomach was lacerated by the chain. Although the laceration healed and he has not experienced difficulty, there is residual scarring which makes the stomach more susceptible to rupture. Consequently, he has sustained damage to his stomach, an important internal organ. The equitable amount of compensation for this damage is $5,000.00.
22. Plaintiff was intubated for a prolonged period of time and the tube irritated his vocal chords to the point that he developed chronic hoarseness. The vocal chords are important parts of the body. The permanent damage to his vocal chords would give rise to compensation in the amount of $2,500.00. Plaintiff also claimed damage to his trachea and cricoid ring, but Dr. Tate indicated that there was no permanent impairment. Dr. Stutesman did not inspect the area in question and did not appear to be aware that the stenosis had been corrected by surgery. Consequently, plaintiff has not found to have sustained significant damage to his trachea or cricoid rings.
23. Plaintiff testified that he had become impotent since the injury and his wife corroborated him, but she indicated that the problem developed primarily after he began taking oral medication for his diabetes. When Dr. Stutesman evaluated him, he complained of problems of maintaining an erection and with diminished awareness and excitement but did not describe total impotence. He would not agree to either a urological or a neurosurgical evaluation. Consequently, he did not establish that he has been rendered permanently impotent as a result of the injury. Rather, he has sustained some damage to his reproductive organs which are important organs of the body. The equitable amount of compensation for this damage is $15,000.00.
24. As a result of the injury and surgical procedures, plaintiff has sustained scarring to his throat, his chest, and his side which is not otherwise covered by permanent partial disability or organ damage. The scars are depicted in photographs in evidence. The effect of the scarring on his future earning capacity would be diminished somewhat by his other more noticeable injuries and his large abdominal scar. However, the disfigurement is serious and permanent and would be presumed to lessen his future opportunities for remunerative employment. The fair and equitable amount of compensation for this loss is $10,000.00.
25. Plaintiff has not sustained permanent damage to his blood. Although he received more than sixty units of blood following the injury, he developed no blood borne diseases from the transfusions.
26. Given his refusal to undergo further surgeries as recommended by Dr. Stutesman, plaintiff has reached maximum medical improvement with respect to all of his injuries and resulting conditions. Plaintiff reached maximum medical improvement with respect to his right and left upper extremities on January 24, 1994. Plaintiff's cervical spine impairment was causally related to plaintiff's compensable injury by Dr. Stutesman after having an MRI done. Plaintiff was given final ratings by Dr. Stutesman on October 3, 1994. On May 29, 1995, Dr. Tate causally related plaintiff's diabetes to the February 2, 1989 injury, subsequent sepsis, pancreatitis and corrective procedures required to keep plaintiff alive.
27. On July 12, 1994, Dr. Tate opined that plaintiff was permanently and totally disabled; however, at that time all of plaintiff's accident-related conditions had not been diagnosed or rated. Accordingly, for the purposes of determining the rate of plaintiff's compensation under the Act, plaintiff is deemed to be classified as permanently and totally disabled as of October 3, 1994. Defendant has been paying benefits under the Form 21 for temporary total disability compensation. According to the figures provided by plaintiff's counsel, an award of compensation for permanent and total disability would pay plaintiff less, assuming a normal life expectancy, than an award for compensation under N.C. Gen. Stat. § 97-31 for permanent partial disability, organ damage and disfigurement. Plaintiff filed a Notice of Election of Benefits under N.C. Gen. Stat. § 97-31 on September 8, 1997 while the case was pending before the Full Commission. However, some of the figures relied upon by plaintiff in his evaluation of compensation due under N.C. Gen. Stat. § 97-31 have been modified by the Full Commission. Therefore, the record herein is reopened for the resubmission of plaintiff's notice of election of benefits based upon the figures contained herein.
28. Defendants are seeking a credit for compensation paid to plaintiff since reaching maximum medical improvement. Should plaintiff elect to receive benefits pursuant to N.C. Gen. Stat. § 97-31, defendants are entitled to a credit for all temporary total compensation paid to plaintiff from October 3, 1994.
29. Plaintiff's average weekly at the time of his accident was $1,011.00. Under the Act, plaintiff would be eligible to receive 66 and 2/3 percent of these wages, or $674.03 per week in compensation. However, the maximum allowable compensation rate in 1989 was $376.00, or 37% of his pre-injury wages. Accordingly, plaintiff is limited to that amount in perpetuity, the Act making no allowances for inflationary increases once a compensation rate is set.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff is permanently and totally disabled as a result of injuries sustained from his compensable February 2, 1989 injury by accident. N.C. Gen. Stat. § 97-29.
2. Plaintiff's cervical spine impairment and diabetes are causally related to his compensable injury.
3. Plaintiff has reached maximum medical improvement with respect to all of his injuries, and is found to be permanently and totally disabled as of October 3, 1994.
4. Plaintiff may elect to receive compensation for permanent and total disability or for permanent partial disability, organ damage and disfigurement. N.C. Gen. Stat. § 97-29; N.C. Gen. Stat. § 97-31; Whitley v. Columbia LumberManufacturing. Co., 318 N.C. 89 (1986).
5. The record shall be left open for plaintiff to make his election. Should plaintiff elect to receive benefits pursuant to N.C. Gen. Stat. § 97-31, defendants are allowed a credit for compensation paid plaintiff since the date plaintiff was determined to be permanently and totally disabled on October 3, 1994. N.C. Gen. Stat. § 97-47.
6. Plaintiff is entitled to such continuing medical treatment as is reasonably required for his compensable injuries.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Plaintiff must submit an election of remedies as between lifetime benefits under N.C. Gen. Stat. § 97-29 or compensation under N.C. Gen. Stat. § 97-31. Should plaintiff elect to receive benefits pursuant to N.C. Gen. Stat. § 97-31, defendants shall pay to plaintiff the following:
Permanent Partial Disability
Left arm (100% ppd) 240 wks x 376.00 = 90,240.00
Right arm (20% ppd) 48 wks x 376.00 = 18,048.00
Left leg (18% ppd) 36 wks x 376.00 = 13,536.00
Right leg (13% ppd) 26 wks x 376.00 = 9,776.00
Back (49% ppd) 147 wks x 376.00 = 55,272.00
Damage to Important Organs Disfigurement
Spleen 20,000.00
Pancreas 20,000.00
 Lungs (20,000 for each lung) 40,000.00
Abdominal wall 15,000.00
Omentum 10,000.00
Intestines 12,000.00
Stomach 5,000.00
Vocal chords 2,500.00
Reproductive organs 15,000.00
 Scarring of throat, chest side (body disfigurement) 10,000.00
2. Should plaintiff elect to receive benefits pursuant to N.C. Gen. Stat. § 97-31, defendants are entitled to a credit for compensation paid to plaintiff since October 3, 1994.
3. Defendants shall pay all reasonably required medical expenses incurred or to be incurred in the future resulting from plaintiff's compensable injury.
4. An attorney's fee of 25% of the Award to plaintiff herein is approved for plaintiff's counsel. This fee shall be deducted from the amount due plaintiff and paid directly to plaintiff's attorney.
5. Defendants shall pay the costs due this Commission.
 S/ ________________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ ______________________ DIANNE C. SELLERS COMMISSIONER
S/ ______________________ DOUGLAS BERGER DEPUTY COMMISSIONER